**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION AT COLUMBUS**

| | |
|---|---|
| ALAN BECK, Derivatively, on behalf of FIRSTENERGY CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. ANDERSON, STEVEN J. DEMETRIOU, JULIA L. JOHNSON, CHARLES E. JONES, DONALD T. MISHEFF, THOMAS N. MITCHELL, JAMES F. O'NEIL III, CHRISTOPHER D. PAPPAS, SANDRA PIANALTO, LUIS A. REYES, LESLIE M. TURNER, STEVEN E. STRAH, ROBERT REFFNER, MICHAEL J. DOWLING, JAMES F. PEARSON, K. JON TAYLOR, AND EBONY YEBOAH-AMANKWAH, <br><br> Defendants, <br><br> FIRSTENERGY CORPORATION, <br><br> Nominal Defendant. | Case no. 2:20-cv-5020 <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Alan Beck ("Plaintiff"), by and through his undersigned attorneys, derivatively, on behalf of FirstEnergy Corporation, brings this derivative action against certain officers and directors of the Company. Plaintiff alleges that the officers and directors of the Company breached their fiduciary duties to the Company, were unjustly enriched, wasted corporate assets, committed insider selling, and committed violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff alleges the following upon personal knowledge with respect to himself and his own acts, and as to all other matters upon information and belief, based upon the substantial

investigation of his counsel, including, among other things, an analysis of: (i) a review of Securities and Exchange Commission ("SEC") filings by FirstEnergy Corp., (ii) media reports about the Company, (iii) case filings in *USA v. Borges*, 1:20-mj-00526 (S.D. Ohio.) (the "Criminal Proceedings"), (iv) case filings in *Owens v. FirstEnergy*, 2:20-cv-03875 (the "Securities Class Action"), (v) press releases, (vi) criminal complaints and affidavits, and (vii) other publicly available documents regarding FirstEnergy.

## NATURE OF ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of FirstEnergy Corporation ("FirstEnergy or the "Company"), against certain of its directors and officers for violations of state and federal laws that occurred from February 21, 2017 through the present (the "Relevant Period"). Investigators called this criminal conduct perpetuated by the Company's directors and officers, "Ohio's largest political corruption scandal."[1]

2.      FirstEnergy is an electric utility headquartered in Akron, Ohio. Its subsidiaries and affiliates are involved in the distribution, transmission, and generation of electricity, as well as energy management and other energy-related services. Its ten electric utility operating companies comprise one of the United States' largest investor-owned utilities, based on serving 6 million customers within a 65,000-square-mile (170,000 km$^2$) area of Ohio, Pennsylvania, West Virginia, Virginia, Maryland, New Jersey and New York. FirstEnergy also owned and operated two nuclear power plants in the State of Ohio, the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station.

3.      The FirstEnergy criminal conduct and political corruption scandal involved $60 million in bribes the Individual Defendants (defined below) caused the Company to pay to Ohio

---

[1] *See* https://www.dispatch.com/story/news/politics/state/2020/07/22/investigators-firstenergy-bankrolled-alleged-ohio-bribery-scheme/42105073/

2

government officials, including Ohio House Speaker Larry Householder ("Householder") and other individuals in exchange for a $1 billion bailout and other favorable legislation. The corruption was evidenced by detailed transcripts of phone calls, recorded conversations, text messages, bank records and contemporaneous documentary evidence.

4.     The Individual Defendants have all served as officers, directors, or executives of FirstEnergy, and purposefully, recklessly, or with gross negligence caused the Company to pay these bribes over several years to compel the passage of Ohio Bill 6, (HB 6) and increase their personal compensation and to keep their positions. Ohio Bill 6 (HB 6) was a bill providing a $1 billion bailout for FirstEnergy and critical to keep the company's failed nuclear facilities in operation. The scheme was in full swing after Householder won the speakership in January 2019, and the bailout passed in July 2019, going into effect in October 2019.[2]

5.     In addition to this "pay to play" scheme exchanging millions in illegal bribes to government officials for a bailout, the Individual Defendants also misrepresented the Company's compliance reports with the state and federal laws regarding regulatory matters.

6.     The bribery continued for several years until a criminal complaint of conspiracy was filed against Householder in the Ohio Southern District on July 17, 2020. Four days later on July 21, 2020, Householder was arrested on charges of conspiracy to commit racketeering.[3]

7.     Also arrested in the bribery scheme were four other men including lobbyists for FirstEnergy and former subsidiary Energy Harbor, previously called FirstEnergy Solutions.

8.     On July 22, 2020, following the news FirstEnergy's stocks lost up to 45% from its closing price of $41.26 per share.

---

[2] https://www.npr.org/2020/07/21/893493224/ohio-house-speaker-arrested-in-connection-to-60-million-bribery-scheme
[3] https://www.npr.org/2020/07/30/897508779/ohio-house-removes-and-replaces-newly-indicted-larry-householder-as-speaker

9.     On July 30, 2020, the Ohio House voted out Householder as speaker.[4]

10.     Despite the transcripts of phone calls, recorded conversations, text messages, bank records and other evidence proving the criminal conduct, Defendant Charles Jones recently denied the allegations stating the Company "acted properly in this matter, and we intend to cooperate fully with the investigation to... ensure our company and our role in supporting [House Bill 6] is understood as accurately as possible."[5]

11.     As discussed herein, the Director Defendants (defined below) breached their fiduciary duties by engaging in the bribery, criminal conduct, personally making and/or causing the Company to issue false and misleading public statements regarding the Company and its compliance with securities laws, and continuing to deny the criminal conduct.

12.     Plaintiff brings this action derivatively to recover the damages suffered by FirstEnergy due to the Defendants' breaches of fiduciary duties and to effect changes to the Company's corporate governance practices and internal control procedures.

13.     Plaintiff made no demand upon the FirstEnergy Board before initiating this action since it would be a wasteful and futile act. The FirstEnergy Board consists of individuals who are neither disinterested nor independent since they are executives, members of management, and benefitted themselves through criminal activity, and face a substantial likelihood of liability for the misconduct described herein, so that there is reasonable doubt that they could act in a disinterested or independent manner.

## VENUE AND JURISDICTION

14.     The Court has jurisdiction over the causes of action asserted under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated

---

[4] *Id*.
[5] https://seekingalpha.com/news/3594886-firstenergy-ceo-asserts-no-wrongdoing-in-pushing-for-nuke-subsidies

thereunder by the SEC, pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act. Supplemental Jurisdiction over the remaining claims exists pursuant to 28 U.S.C. § 1367. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this District and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements into this District. In addition, the Criminal Proceeding and Securities Class Action is pending in this District, as is civil litigation against the Company for the complained of scheme by Ohio ratepayers, *Smith v. FirstEnergy Corp.*, et al., 2:20-cv-3755 (S.D. Ohio).

## PARTIES

17. Plaintiff Alan Beck ("Beck") is a current shareholder of FirstEnergy and will continue to hold FirstEnergy stock at all times during the pendency of this litigation. Beck has continuously held FirstEnergy stock since prior to the start of the Relevant Period. Beck is a citizen of Illinois. A signed verification from Beck is attached as Exhibit A.

18. Defendant Michael J. Anderson ("Anderson") is Chairman of the board of directors of The Andersons, Inc. He has been a Director of FirstEnergy since 2007 and serves on the Board's Audit and Finance Committees. On July 1, 2020, Anderson reported owning 59,181 shares of common stock.

5

19. Defendant Steven J. Demetriou ("Demetriou") is Chairman, Chief Executive Officer and a director of Jacobs Engineering Group Inc. He has been a Director of FirstEnergy since 2017 and serves on the Finance, Operations, Safety and Nuclear Oversight Committees. On July 1, 2020, Demetriou reported owning 9,651 shares of common stock.

20. Defendant Julia L. Johnson ("Johnson") is President of NetCommunications, LLC. She has been a Director of First Energy since 2011and serves on the Corporate Governance and Corporate Responsibility (Chair) and Finance Committees. On July 1, 2020, Johnson reported owning 10,750 shares of common stock.

21. Defendant Charles E. Jones ("Jones") has been President, CEO, and a director of First Energy since 2015. On March 1, 2020, Jones exercised an option to sell 407,466.991 shares of his FirstEnergy stock for $44.40 per share, yielding proceeds of $18,091,534.40. Jones still owns 699,356 shares and reportedly earns $14,684,700 a year in salary. Defendant Jones sold shares with insider information regarding the Company' bribery scheme, which resulted in FirstEnergy stock trading at artificially inflated prices at the time of his stock sales.

22. Defendant Donald T. Misheff ("Misheff") is retired as managing partner of the Northeast Ohio offices of Ernst & Young LLP. He has been non-executive Chairman of the FirstEnergy Board since May 2018 and Director of FirstEnergy since 2012. He also serves on the Audit; Corporate Governance and Corporate Responsibility Committees. On July 1, 2020, Misheff reported owning 37,157 shares of common stock.

23. Defendant Thomas N. Mitchell ("Mitchell") is Chairman of the World Association of Nuclear Operators. He has been a Director of FirstEnergy since 2016 and serves on the Corporate Governance and Corporate Responsibility, Operations, and Safety and Nuclear

Oversight (Chair) Committees. On July 1, 2020, Mitchell reported owning 18,985 shares of common stock.

24.     Defendant James F. O'Neil, III ("O'Neill") is Principal owner of Forefront Solutions, LLC. He has been a Director of FirstEnergy since 2017 and serves on the Compensation (Chair), Operations, and Safety and Nuclear Oversight Committees. On July 1, 2020, O'Neil reported owning 14,129 shares of common stock.

25.     Defendant Christopher D. Pappas ("Pappas") is retired as president and chief executive officer of Trinseo. He has been a Director of FirstEnergy since 2011and serves on the Compensation and Finance (Chair) Committees. On July 1, 2020, Pappas reported owning 49,957 shares of common stock.

26.     Defendant Sandra Pianalto ("Pianalto") is retired as president and chief executive officer of the Federal Reserve Bank of Cleveland. She has been a Director of FirstEnergy since 2018 and serves on the Compensation and Audit Committees. On July 1, 2020, Pianalto reported owning 5,538 shares of common stock.

27.     Defendant Luis A. Reyes ("Reyes") is retired as a regional administrator of the U.S. Nuclear Regulatory Commission and has been a Director of FirstEnergy since 2013. Reyes serves on the Corporate Governance and Corporate Responsibility, Operations, and Safety and Nuclear Oversight Committees. On July 1, 2020, Reyes reported owning 30,782 shares of common stock.

28.     Defendant Leslie M. Turner ("Turner") is retired as senior vice president, general counsel, and corporate secretary of The Hershey Company. She has been a Director of FirstEnergy since 2018 and serves on the Audit and Compensation Committees. On July 1, 2020, Turner reported owning 1,929 shares of common stock.

29.     Defendant Steve E. Strah ("Strah") is President of First Energy. He previously served as FirstEnergy's CFO from March 2018 until he transitioned to his current position in May 2020. Prior to March 2018, defendant Strah served as Senior Vice President of FirstEnergy's Utilities Operations. He is a member of FirstEnergy's Leadership Council.

30.     Defendant Robert Reffner ("Reffner") is Senior Vice President and Chief Legal Officer, and a member of FirstEnergy's Leadership Council. Reffner is responsible for, among other things, FirstEnergy's Legal, Ethics, Risk and Internal Auditing.

31.     Defendant Michael Dowling ("Dowling") is Senior Vice President, External Affairs, and member of FirstEnergy's Leadership Council. Dowling is responsible for FirstEnergy's local, state and federal Governmental Affairs; Energy Policy; State Regulatory Affairs and Market Policies; Economic Development; Corporate Affairs and Community Involvement, and the FirstEnergy Political Action Committee.

32.     Defendant Ebony Yeboah-Amankwah ("Yeboah-Amankwah") is Vice President, General Counsel and Chief Ethics Officer, and member of FirstEnergy's Leadership Council.

33.     Defendant K. Jon Taylor ("Taylor") took over as FirstEnergy's CFO from Defendant Strah. Prior to assuming this position, he was the Company's Controller and Chief Accounting Officer until March 2018 when Taylor was named president of Ohio Operations. He was promoted to Vice President, FirstEnergy Utilities in April 2019, and elected to his current position in May 2020.

34.     Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes and Turner are referred to collectively as the "Director Defendants." Defendants Jones, Strah, Reffner, Dowling and Ebony Yeboah-Amankwah are referred to

collectively as the "Officer Defendants." The Director Defendants and the Officer Defendants are, collectively, the "Individual Defendants."

35.    Defendants O'Neil, Anderson, Misheff, Pianalto, and Turner were all members of the Audit Committee and are referred to collectively as the "Audit Committee Defendants."

36.    Defendants Anderson, Johnson, Misheff, Mitchell, and Reyes were all members of the Corporate Governance and Corporate Responsibility Committee and are referred to collectively as the "Corporate Governance and Corporate Responsibility Committee Defendants."

37.    Nominal Defendant FirstEnergy is an Ohio corporation headquartered at 76 South Main Street, Akron, Ohio.

## THE FIDUCIARY DUTIES OF THE DEFENDANTS

38.    Defendants owed First Energy and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage FirstEnergy in a fair, just, honest, and equitable manner, by virtue of their positions as officers, directors, and/or fiduciaries of FirstEnergy.

39.    Each director and officer of the Company owes to FirstEnergy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

40.    To discharge their duties, the officers and directors of FirstEnergy were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of FirstEnergy were required to adhere to the FirstEnergy's Code of Conduct:

9

i.   ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Ohio and the United States, and pursuant to FirstEnergy's own Code of Business Conduct (the "Code of Conduct");

ii.   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

iii.   remain informed as to how FirstEnergy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

iv.   establish and maintain systematic and accurate records and reports of the business and internal affairs of FirstEnergy and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

v.   maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that FirstEnergy's operations would comply with all applicable laws and FirstEnergy's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

vi.    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

vii.   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

viii.  examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

41.    Each of the Defendants further owed to FirstEnergy and the shareholders the duty of loyalty requiring that each Defendant favor FirstEnergy's interest and that of its shareholders over his or her own while conducting the affairs of the Company and refrain from using his or her position, influence, or knowledge of the affairs of the Company to gain personal advantage.

42.    At all times relevant hereto, the Defendants were the agents of each other and of FirstEnergy and were at all times acting within the course and scope of such agency.

43.    Because of their advisory, executive, managerial, and directorial positions with FirstEnergy, each of the Defendants had access to adverse, non-public information about the Company.

44.    The Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements made by FirstEnergy.

45.    Defendants owe fiduciary duties to FirstEnergy and its shareholders, including duties of loyalty, good faith, and candor. In addition, FirstEnergy's foundational corporate

11

documents detail the requirements of the Board's duties, requiring, inter alia, that the Board actively identify and report any illegal and/or unethical business practices within the Company.

**A.    FirstEnergy's Code of Business Conduct**

46.    FirstEnergy's Code of Business Conduct provides, in part, as follows:

***This Code of Business Conduct (the "Code")*** serves as a reminder of the high standards we must meet in our day-to-day business activities. It also helps to guide us when formulating and pursuing Company goals and objectives.
FirstEnergy personnel are all responsible for complying with applicable laws and regulations and the principles and provisions included in this Code.
No single book or code of conduct policy can provide answers to every situation. This Code is to be used as a guide for ethical conduct and help foster a culture of honesty and accountability. It is endorsed by FirstEnergy's Board of Directors and executives, communicates our culture of intolerance for retaliation, provides policy guidance, and concludes with a question and answer section.

It is the responsibility of every one of us to comply with all applicable laws, rules and regulations and all provisions of this Code and related policies and procedures. This Code is designed to encourage you to lead by example with ethics and integrity and engage in open, honest, direct, and ongoing dialogue. In addition, our Company has adopted a Corporate Compliance Program ("Program") to assist all business units and personnel to fully comply with all applicable laws, regulations, and policies. The Program demonstrates that we intend to operate our business in accordance with sound business ethics. It includes many guiding principles for specific standards of conduct.

*"Maintaining high ethical standards builds trust with customers, shareholders, FirstEnergy Personnel, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job."*

 ***Fair Dealing*** - We have built a reputation as a trustworthy and ethical member of our community and our industry. We are committed to maintaining the highest levels of integrity and fairness within our Company. When we fail to negotiate, perform, or market in good faith, we may seriously damage our reputation and lose the loyalty of our customers. You must conduct business, including dealings with the Company's customers, suppliers, competitors and other personnel, Code of Business Conduct 6 honestly and fairly and not take unfair advantage of anyone through any misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud, bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices. Also, please be aware that special rules apply when dealing with government

12

employees. You should direct any questions about dealing with government employees to your supervisor.

*Conflicts of Interest* - We should all be aware of any potential influences that impact or appear to impact our loyalty to FirstEnergy. A "conflict of interest" can occur when your personal interest interferes with – or may appear to interfere with – the interests of the Company as a whole, or when your personal interests make it difficult for you to perform your job duties objectively and effectively. Conflicts of interest also arise when personnel, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position with the Company. Avoid situations in which your personal interests are in conflict, or appear to be in conflict, with the interests of the Company or your job responsibilities. This includes the use of knowledge gained through your work activities to make decisions that will lead to personal gain and that are contrary to the law or the interests of the Company. This also includes financial relationships, including equity interests and loans to, or guarantees of obligations of, the party with the FirstEnergy relationship. Furthermore, the Company will not make any loans or guarantees to executive officers or their family members. You also have the specific responsibility of understanding and abiding by the Company's expanded Conflicts of Interest Policy.

47.    FirstEnergy's Conflict-Of-Interest Policy also states, among other things, that: All personnel, including the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer, have an obligation to conduct Company-related business in an environment free from the influence of conflicting personal interests. Generally, a conflict of interest arises when our position or job responsibilities present an opportunity for personal gain or when an obligation or situation resulting from our personal activities and financial affairs may influence our judgment and action in the performance of our Company duties.

**B.    Additional Duties of the Audit Committee Members**

48.    The Company's Audit Committee is specifically tasked with the Board's oversight responsibilities. The conduct of the Audit Committee is governed by the Audit Committee Charter. Per the Audit Charter, the purpose of the Audit Committee it to, *inter alia*: is "assist the Board with oversight of: (a) The integrity of the Company's financial statements; (b) The Company's compliance with legal, risk management and regulatory requirements; (c) The

13

independent auditor's qualifications and independence; (d) The performance of the Company's internal audit function and independent auditor; and (e) The Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies and compliance with legal and regulatory requirements.

49.     The Audit Committee Charter lists the following as responsibilities of the Audit Committee:

> 1.     The Committee shall be directly responsible for the appointment, compensation and retention of (subject to shareholder ratification, if such ratification is required), and the oversight of the work and pre-approval of all auditing services provided by, any registered public accounting firm engaged (including resolution of disagreements between management and the auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The independent auditor shall audit the consolidated financial statements of the Company and the consolidated financial statements of selected subsidiaries for the fiscal year for which it is appointed and report directly to the Committee.
>
> 2.     At least annually, the Committee shall obtain, review and, to the extent necessary, discuss with the independent auditor a report by the independent auditor describing:
>
> > i.   the independent auditor's internal quality-control procedures;
> > ii.  or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the independent auditor's firm, and the steps taken to deal with those issues; and
> > iii. all relationships between the independent auditor and the Company, in order to assess the auditor's independence.
>
> 3.     After reviewing the foregoing report and after consideration of the independent auditor's work throughout the year, the Committee shall evaluate the independent auditor's qualifications, terms of engagement, compensation, performance and independence, which shall include the review and evaluation of the lead partner of the independent auditor. In making its evaluation, the Committee shall take into account the opinions of management and internal auditors. The Committee shall present its conclusions with respect to the independent auditor to the Board.

4.     The Committee shall ensure the regular rotation of the lead audit partner and concurring partner of the independent auditor every five (5) years and consider whether it would be appropriate to implement a regular rotation of the independent auditor firm.

5.     The Committee shall also review and discuss reports by the independent auditor regarding: (a) all critical accounting policies and practices used by the Company; (b) significant financial reporting issues and judgments made in connection with the preparation of financial statements, including all alternative treatments of the Company's financial information within generally accepted accounting principles ("GAAP") that have been discussed with management officials, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and (c) any other material written communication between the independent auditor's firm and the Company's management, such as any management letter or schedule of unadjusted differences. The Committee shall have full access to the Company's books and personnel.

6.     The Committee, as a whole or through the Chair, shall review and discuss with management, the internal auditor, and the independent auditor prior to filing the Company's Reports on Forms 10-K or 10-Q, any major issues regarding accounting principles and financial statement presentation, including the impact on the financial statements of significant events, transactions or changes in the Company's selection or application of accounting principles or estimates that potentially affect the quality of the financial reporting, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

7.     The Committee shall review and discuss with management and the independent auditor, management's report on internal control over financial reporting and the independent auditor's attestation of the Company's internal control over financial reporting prior to the filing of the Company's Form 10-K.

8.     The Committee shall review disclosures made to the Committee by the Company's chief executive officer and chief financial officer during their certification process for Forms 10-K and Forms 10-Q regarding any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

9.     In connection with its review of the Company's financial statements, the Committee shall review and discuss with management, the internal auditor and the independent auditor the matters the independent auditor is required to discuss with the Committee under auditing standards established by the Public Company Accounting Oversight Board, including Auditing Standard No. 1301, and under

the rules and regulations of the SEC and other applicable authorities (as such standards and rules and regulations may be established and amended from time to time).

10.     The Committee shall regularly review with the independent auditor any audit problems or difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management and management's response to them. The review should also include discussion of the responsibilities, budget, activities, and organizational structure (including staffing) of the internal audit function. The Committee shall review any significant findings and recommendations of the internal auditing function together with management's responses to them.

11.     Based on its review and discussions with management, the internal auditor and the independent auditor, the Committee shall recommend to the Board whether the Company's financial statements should be included in the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of the Form 10-K).

12.     Review and discuss with management and the independent auditor all off-balance sheet arrangements and the effect of regulatory and accounting developments onthe Company's financial statements.

13.     Although the Committee shall not be required to pre-approve or discuss in advance each earnings release or each instance in which the Company ma provide earnings guidance, the Committee shall review and discuss with management press releases related to the Company's earnings, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to financial analysts and rating agencies.

14.     The Committee shall meet separately, periodically, with management, with internal auditors, with independent auditors, with the Chief Risk Officer, and with the general counsel. Further, the Committee shall, at least annually, meet with the Company's independent auditor, without the presence of any Company employees, in order to review the results of each independent audit of the Company, the report of the audit, any related management letter, management responses to recommendations made by the independent auditor in connection with the audit, all significant reports of the internal auditing department, and management's responses to those reports.

15.     At least annually, the Committee shall review and approve the scope and plan of the work to be done by the Company's internal audit function, and review the results of such work. The Committee shall oversee, require and review periodic evaluations of the Company's internal control and corporate compliance structures, including the charter of the internal audit function to reasonably assure

that it is consistent with that recommended by the Institute of Internal Auditors, and the resources provided to the internal audit group to reasonably assure that it has sufficient resources to carry out its charter. At least annually, the Committee shall approve the Internal Auditing Business Practice.

16. The Committee shall periodically review with the Chief Audit Officer the adequacy of the Company's internal controls and corporate compliance structures, including computerized information system controls and security, to reasonably determine, at a minimum, that: (a) components of the Company's internal control and corporate compliance structures are regularly evaluated; (b) such evaluations are performed by qualified personnel; and (c) such evaluations have reasonable scope and depth of coverage and are conducted with sufficient frequency. The Committee shall discuss with the independent auditors any significant matters regarding internal controls over financial reporting that have come to their attention during the conduct of the audit, in addition to reviewing with the independent auditor the Company's compliance with the requirements of the Sarbanes-Oxley Act of 2002, as may be amended from time to time.

17. The Committee shall consider and review Directors', officers' and management's Company-funded expenses.

18. The Committee shall oversee, assess, discuss, and review the Company's policies with respect to the Company's major financial risk exposures and the assessment and management of risks, such as risks related to the financial statements and financial reporting process of the Company, credit risk, liquidity and commodity market risks, and risks related to cybersecurity, and discuss with management the steps taken to monitor, control and mitigate such exposures.

19. The Committee and the Board shall annually discuss and review with the Company's Chief Risk Officer the Company's risk assessment and risk management guidelines, policies and procedures.

20. Periodically, the Committee shall meet with appropriate members of management to review adherence to applicable federal, state, and local laws and corporate policies and review processes relating to training, monitoring and reporting of policy compliance. In particular, the Committee shall review the Company's Code of Business Conduct to determine that it is designed to provide adequate protection against violations of applicable laws and regulations, and shall review the record keeping and reporting systems to measure and monitor regulatory compliance requirements. In general, the Committee shall also periodically review the Company's policies and procedures regarding compliance with the Company's Code of Business Conduct and the Company's Conflicts-of-Interest Policy, and methods for disseminating information regarding the foregoing policies. The Committee shall review corrective actions taken by the Company when significant internal or corporate compliance problems are reported. If the Committee becomes aware of any significant deficiency from

corporate compliance programs or internal control programs, or of material violations of established corporate policies or legal and regulatory requirements, it shall: (a) reasonably determine that all appropriate corrective actions have been taken in response thereto, and that such actions are sufficient under the circumstances; (b) review any management override (which shall include waivers permitted by policies or procedures) of corporate compliance programs and internal control programs, and take the steps necessary to reasonably determine that such action or override will not occur in the future without Board approval; and (c) review the process for reporting deficiencies or violations to reasonably assure that the Chief Audit Officer and the Chief Ethics Officer are informed of such deficiencies or violations.

21.     The Committee shall establish procedures for:

i. the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and

ii. the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters.

22.     The Committee may cause on-going educational programs related to appropriate financial and accounting practices to be made available to Committee members.

23.     The Committee shall communicate to the Board any issues with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors or the performance of the internal audit function.

24.     The Committee shall prepare the Audit Committee Report required by SEC rules to be included in the Company's annual proxy statement.

25.     The Committee shall report regularly to the Board concerning its activities.

26.     The Committee shall serve as a channel of communication between the independent auditor and the Board, and between the Chief Audit Officer and the Board.

27.      The Chief Audit Officer functionally reports to the Committee and administratively to the Senior Vice President & Chief Financial Officer. The Committee will at least annually assess this reporting relationship in accordance with the Institute of Internal Auditors International Professional Practices Framework Standards and associated Practice Advisories.

28.     The Committee shall discuss with management and the independent auditor any published reports or correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

29.     The Committee shall annually obtain from the independent auditor assurance that Section 10A(b) of the Exchange Act has not been implicated.

30.     The Committee shall discuss with the independent auditors material issues on which the national office of the independent auditors was consulted by the Company's audit team.

50.     The Audit Committee members and other Individual Defendants failed to maintain the standards laid out by both the law and the Company, resulting in the breaches of fiduciary duty and the violations of Section 14(a) and Rule 14a-9 described herein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

51.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

52.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

53.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with

gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During the Relevant Period, Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were a direct, necessary, and substantial participant in the common enterprise, and/or common course of conduct complained herein because the action described herein occurred under the authority and approval of the Board.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

55.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and FirstEnergy and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

56.      FirstEnergy is headquartered in Akron, Ohio with subsidiaries involved in the distribution, transmission and generation of electricity, as well as energy management and other energy-related services and has several subsidiaries and affiliates. Ten of its subsidiaries

comprise one of the largest investor-owned utilities in the country serving more than six million customers in Ohio, Pennsylvania, West Virginia, Virginia, Maryland, New Jersey, and New York.

57. The Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station are the two nuclear power plants owned and operated by FirstEnergy in the State of Ohio through its subsidiaries FirstEnergy Solutions Corp. ("FES") and FirstEnergy Nuclear Operating Company ("FENOC").[6] FirstEnergy was fined $28 million for misleading the regulators regarding the damage as part of a deferred-prosecution agreement after it was discovered that the Davis-Besse Nuclear Power Station was the worst site corrosion ever found at a U.S. reactor and the plant was consequently closed from 2002 to 2004 for the purpose of repairs. The revenue from the two plants was diminished significantly as the cost of maintenance of the plants increased and the demand for nuclear energy decreased with the decrease in prices of alternative fuels like natural gas.

58. Owing in large part to challenges associated with its nuclear energy affiliates FENOC and FES and low demand, FirstEnergy reported a weak energy market, poor forecast demand and hundreds of millions of dollars in losses in the fiscal year 2016. The Defendants, reassured investors that FirstEnergy was pursuing a legislative fix to turn around its nuclear energy fortunes. For example, in FirstEnergy's 2016 Annual Report, filed on February 21, 2017, the Company stated that it intended to pursue "legislative or regulatory solutions" to address the problem. Likewise, FirstEnergy's CEO, Defendant Jones, repeated this plan on the Company's

---

[6] FES and FENOC were renamed Energy Harbor LLC (a subsidiary of Energy Harbor Corp.) and Energy Harbor Nuclear Corp., respectively after a March 2018 bankruptcy and reorganization. Although these subsidiaries were separated and deconsolidated from FirstEnergy's financial results, the Company continued to have numerous, material financial entanglements with FES and FENOC and an active role in financing and overseeing the corrupt conspiracy to pass HB6 as detailed herein.

annual earnings call held with investors the next day, stating that FirstEnergy sought "legislative or regulatory initiatives for [nuclear power] generation that recognize its environmental or energy security benefits." This 2016 10-K was signed by all of the Director Defendants certifying to its accuracy.

59.     While the analysts and investors received the idea of "solutions" favorably, it was kept from them that the Company's legislative "solution" involved an illicit campaign to corrupt high-profile state legislators in order to secure a massive taxpayer-funded bailout. FirstEnergy ran an elaborate scheme to funnel tens of millions of dollars to state lawmakers, blanket media platforms with misleading messages, and illicitly thwart a citizens' ballot initiative. The senior most officers of the Company, including the CEO, were either aware of the illicit activities or reckless in not knowing, and likely an active part thereof.

### B.     Bribery Conspiracy

60.     In January 2017, when Householder met with FirstEnergy representatives during a flight on a private FirstEnergy jet; during or around this flight, he began what a lobbyist at FirstEnergy referred to as an *"unholy alliance"*, where in exchange of payments of millions of dollars, Householder promised to secure the passage of legislation, House Bill 6 (HB 6) that would provide a $1.3 billion bailout of FirstEnergy's failed nuclear power plants funded by Ohio ratepayers.

61.     In February 2017, with the help of establishments of "Generation Now" and "Energy Pass-Through" 501(c)(4) organizations, the conspiracy was brought into action. Through these organizations dark money was systematically funneled to Householder and his affiliates. Householder received periodic payments of $250,000; the amount increased to a

million dollars per month. In all, more than $60 million was paid by FirstEnergy and its affiliates to Householder and his operatives in furtherance of the bribery scheme.

62.     These secret payments supported the political campaigns of over 20 state legislative candidates, paid their staff and covered the cost of mailers and commercials. Most of these candidates won their elections and voted for Householder as the speaker but also voted for the legislative bailout of FirstEnergy nuclear plants in spite of their disapproval. These funds were also used by Householder for his own enrichment, such as purchasing house property in Florida and settling a lawsuit against him.

63.     Upholding his side of the bargain, Householder swiftly moved towards creating a standing subcommittee on energy generation after securing the votes for HB6 and defending the bill against a citizens' ballot initiative. This law not only prevented the two money- losing power plants from shutting down but also granted a $9 per megawatt hour subsidy to "clean" energy generation costing Ohio ratepayers a monthly fixed charge, ratcheting up energy costs for millions of consumers. The Bill benefitted the FirstEnergy subsidiaries the most with approximately 94% of these payments projected to them, worth an estimate of ***$164 million annually.***

64.     When the Bill was signed into law, thousands of people were agitated and citizen groups started working to get on the ballot a voter referendum to repeal the law. In order to prevent the signing of petitions, FirstEnergy started funding yet another round of highly misleading political advertisements through its dark money network, hired top signature collection firms, and bribed signature collectors in order to subvert the ballot campaign's efforts.

**C.     Investigation and criminal complaint against Householder**

23

65.     On July 17, 2020, U.S. officials announced the filing of a criminal complaint of conspiracy against Householder and others in the Southern District of Ohio. This caused FirstEnergy to lose up to 45% of its stock value.

66.     It was alleged by the United States that, in 2016, Householder and Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes and a Householder-controlled the 501(c)(4) organization,  Generation Now, being persons employed by and associated with an enterprise which engaged in activities which affected interstate commerce, did knowingly and intentionally conspire with each other and others known and unknown to violate Title 18 United States Code, Section 1962(c). That is, to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts indictable under 18 U.S.C. §§ 1343, 1346 (relating to honest services wire fraud); 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion); 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under Ohio Revised Code § 3517.22(a)(2)); 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery, chargeable under Ohio Revised Code § 2921.02. It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise, all in violation of 18 U.S.C. § 1962(d).

67.     An "Enterprise" was constituted as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact to continue the money racketeering activity from March 2017 to March 2020. Through Generation Now, entirely

in control of Householder, approximately $ 60 million were paid to the Householder Enterprise in the said period.

Table 1. FirstEnergy's payment to Generation Now Bank Account

| Date | Amount | Method | Source |
|------|--------|--------|--------|
| 3/16/2017 | $250,000 | Wire | FirstEnergy |
| 5/17/2017 | $250,000 | Wire | FirstEnergy |
| 8/10/2017 | $250,000 | Wire | FirstEnergy |
| 12/8/2017 | $250,000 | Wire | FirstEnergy |
| 3/15/2018 | $300,000 | Wire | Energy Pass-Through |
| 5/4/2018 | $100,000 | Wire | Energy Pass-Through |
| 8/16/2018 | $500,000 | Wire | Energy Pass-Through |
| 10/16/2018 | $400,000 | Check | FirstEnergy |
| 10/29/2018 | $100,000 | Check | FirstEnergy |
| 4/30/2019 | $1,500,000 | Wire | FirstEnergy |
| 5/7/2019 | $1,500,000 | Wire | FirstEnergy |
| 5/15/2019 | $2,500,000 | Wire | FirstEnergy |
| 5/22/2019 | $2,500,000 | Wire | FirstEnergy |
| 5/29/2019 | $1,500,000 | Wire | FirstEnergy |
| 6/5/2019 | $2,000,000 | Wire | FirstEnergy |
| 6/13/2019 | $1,361,899 | Wire | FirstEnergy |
| 6/20/2019 | $2,116,899 | Wire | FirstEnergy |
| 7/5/2019 | $1,879,457 | Wire | FirstEnergy |

| 8/2/2019 | $734,250 | Wire | FirstEnergy |
|---|---|---|---|
| 8/7/2019 | $4,390,000 | Wire | FirstEnergy |
| 8/22/2019 | $653,000 | Wire | FirstEnergy |
| 8/29/2019 | $2,003,000 | Wire | FirstEnergy |
| 9/5/2019 | $2,403,000 | Wire | FirstEnergy |
| 9/12/2019 | $2,403,000 | Wire | FirstEnergy |
| 9/19/2019 | $4,695,000 | Wire | FirstEnergy |
| 9/26/2019 | $2,445,000 | Wire | FirstEnergy |
| 10/3/2019 | $4,160,000 | Wire | FirstEnergy |
| 10/8/2019 | $1,600,000 | Wire | FirstEnergy |
| 10/10/2019 | $10,000,000 | Wire | Energy Pass-Through |
| 10/17/2019 | $248,000 | Wire | FirstEnergy |
| 10/22/2019 | $3,000,000 | Wire | FirstEnergy |
| | $4,330.86 | Cashier Check | Energy Pass-Through |
| 3/3/2020 | $2,000,000 | Wire | Energy Pass-Through |
| **Total:** | **$59,996,835.86** | | |

68.     This money was paid to the enterprise in exchange for passing HB 6 which would provide a huge bailout to the unprofitable nuclear facilities. On May 29, 2019, HB 6 passed the House, and after Enterprise members exerted pressure on the Senate, the legislation was passed and was signed into law by the Governor.  However, the law would not go into effect until October 22, 2019. Shortly after the Governor signed the legislation, a campaign began to

26

organize a state-wide ballot initiative referendum ("Ballot Campaign") to overturn the legislation. This required Ballot Campaign organizers to collect the signatures of registered voters in order to put the referendum of HB 6 on the 2020 ballot.

69.     In response, from July 24 to October 22, 2019, FirstEnergy-controlled accounts wired over $38 million into Generation Now. The Enterprise funneled the money to various accounts and entities controlled by the Enterprise to purchase media ads and mailers against the ballot initiative, to conflict out signature collection firms, and to pay off and bribe signature collectors supporting the referendum. The members and associates of the Enterprise also used the FirstEnergy money to enrich themselves and further their personal interests.

70.     Although Householder's name is not on Generation Now's paperwork, Householder's statements, Clark's statements and a review of documentation obtained pursuant to search warrants and grand jury subpoenas show that Householder controlled Generation Now to further the Enterprise's goals.

71.     Under Ohio law, in order to place a referendum on the ballot, a group must collect 1,000 certified signatures and submit proposed ballot language to the Ohio Attorney General for approval. The approval ensures that the description of the referendum meets the "fair and truthful" standard outlined in the Ohio Revised Code.

72.     HB 6 was important to the Householder's Enterprise because it received millions of dollars into Generation Now from FirstEnergy in exchange for enactment of the bailout legislation. Thus, the repeal of HB 6, which would prevent HB 6 from taking effect in October 2019, was viewed as a threat to Householder's Enterprise. In the wake of negative press and pressure from House leadership relating to Generation Now media buys supporting HB 6, the Enterprise used "Front Company," which was controlled by the Enterprise, to conceal their

27

efforts to combat the referendum. Ultimately, the Enterprise pumped $23,000,000 of FirstEnergy-to Generation Now money into Front Company and used the organization to fund criminal acts to defeat the referendum. The Enterprise's efforts were a success: on October 21, 2019, the Ballot Campaign failed to collect enough signatures, and HB 6 went into effect.

73.     Certain Individual Defendants profited from these activities by selling millions of dollars worth of FirstEnergy stock at artificially inflated prices. Defendant Jones alone sold nearly $10 million worth of his FirstEnergy shares in insider sales that were highly suspicious in both timing and amount as compared to past practice.

### D.     Defendants' False and Misleading Statements

74.     FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"), which was signed by all Director Defendants, Pearson and Taylor. The 2016 10-K stated that FirstEnergy would be exploring "legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits." The 2016 10-K also stated with respect to FES, FirstEnergy's nuclear subsidiary, that "management is exploring capital and other cost reductions, asset sales, and other options to improve cash flow as well as continuing with legislative efforts to explore a regulatory solution." The 2016 10-K further stated that FES "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities." Defendants Jones and Pearson also filed signed certifications with the SEC stating that the 2016 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

75.     During Company's fourth quarter 2016 earnings conference call on February 22, 2017, the President and CEO Jones stated:

In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero emission nuclear program is expected to be introduced soon. The ZEN program is intended to give state lawmakers greater control and flexibility to preserve valuable nuclear generation. We believe this legislation would preserve not only zero emission assets but jobs, economic growth, fuel diversity, price stability, and reliability and grid security for the region. We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that [Company A] won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.

76.     The quarterly reports on form 10-Q, filed by FirstEnergy on April 27, 2017, July 27, 2017 and October 26, 2017 and signed by Defendant K. Jon Taylor and the Controller and Treasurer Jason J. Lisowski, claimed that FirstEnergy's nuclear power business continued to comply "with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities." They also highlighted their reliance on "legislative solutions" for fixing the unprofitable nuclear facilities. They continued to highlight the efforts of FirstEnergy's management to secure a regulatory or legislative fix for the problems posed by the Company's unprofitable nuclear facilities. For example, the quarterly reports stated that FirstEnergy's management was "continuing with legislative efforts to explore a regulatory solution" for FES or was "continuing . . . efforts to explore legislative or regulatory solutions" for FES.

77.     Defendants Jones and Pearson also filed signed certifications with the SEC stating that the quarterly reports fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and the reports fairly presents, in all material respects, the financial condition and results of operations of the Company.

78.     On February 20, 2018, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"), which was signed by the

Director Defendants Jones, and Pearson and Taylor. The 2017 10-K stated that FirstEnergy would be exploring "legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits." The 2017 10-K further stated that FES "complies with the regulations, orders, policies and practices prescribed by the SEC, FERC, NRC and applicable state regulatory authorities." Defendants Jones and Pearson also filed signed certifications with the SEC stating that the 2017 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

79.    On February 21, 2018, FirstEnergy held an earnings call with analysts and investors to discuss its fiscal 2017 financial results led by defendants Jones, Pearson and Taylor. During the call, Defendant Jones stated that FirstEnergy had been "very actively involved in a multitude of efforts at both the state and federal levels to support our generation assets," but he was disappointed that those efforts had not yet resulted in "meaningful legislative or regulatory support" for the Company's nuclear facilities. He stated that FES would "continue to look at all options regarding these units," including by "continuing to support policy solutions."

80.    On April 23, 2018, July 31, 2018 and October 25, 2018, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2018, June 30, 2018 and September 30, 2018, respectively signed by its Vice President, Controller and Chief Accounting Officer Jason J. Lisowski. These documents claimed that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or

misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud.

81.     On February 19, 2019, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"), which was signed by defendants Jones and Strah. The 2018 10-K stated that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the 2018 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

82.     On February 20, 2019, FirstEnergy held an earnings call with analysts and investors to discuss its fiscal 2018 financial results led by defendants Jones and Strah. In response to an analyst's question about whether there was "anything at all" that FirstEnergy was working on with respect to energy utility legislation in Ohio, defendant Jones responded: "Not in any specific form, Julien. Obviously, if our new leaders of the states – we have a new governor, a new speaker of the house, we're going to have a new Chairman of the Public Utilities Commission. If they determine that they think the time is right to really put energy policy for the state back on the table in some fashion, legislatively, then we would expect to engage and provide our input. But it's too early in the process for me to talk about what that might mean."

83.     On April 23, 2019, July 23, 2019 and November 4, 2019, FirstEnergy filed with the SEC its quarterly reports on Form 10-Q for the quarters ending March 31, 2019, June 30, 2019 and September 30, 2019, respectively. These documents claimed that FirstEnergy "and its

subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly reports did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, were the product of effective internal controls, and were free from fraud.

84.     On February 10, 2020, FirstEnergy filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"), which was signed by defendants Jones and Strah. The 2019 10-K stated that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the 2019 10-K did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

85.     On April 23, 2020, FirstEnergy filed with the SEC its quarterly report on Form 10-Q for the quarter ending March 31, 2020. The quarterly report claimed that FirstEnergy "and its subsidiaries follow GAAP and comply with the related regulations, orders, policies and practices prescribed by the SEC, FERC, and, as applicable, the NRC, the PUCO, the PPUC, the MDPSC, the NYPSC, the WVPSC, the VSCC and the NJBPU." Defendants Jones and Strah also filed signed certifications with the SEC stating that the quarterly report did not contain any false or misleading statement of fact, fairly presented FirstEnergy's results of operations, was the product of effective internal controls, and was free from fraud.

86.     The statements referenced in this section were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by the Individual Defendants:

a.  that FirstEnergy and its representatives and affiliates had orchestrated a $60 million campaign to corrupt the political process in order to secure the passage of legislation favoring the Company and its affiliates;

b.  that FirstEnergy and its representatives and affiliates had secretly funneled tens of millions of dollars to Ohio politicians to bribe those politicians in order to secure votes in favor of HB6, a $1.3 billion ratepayer bailout for FirstEnergy's unprofitable nuclear facilities;

c.  that FirstEnergy and its representatives and affiliates had conducted a massive, misleading advertising campaign in support of HB6 and in opposition to a ballot initiative to repeal HB6 by passing millions of dollars through an intricate web of 'dark money' entities and front companies in order to conceal the Company's involvement;

d.  that FirstEnergy and its representatives and affiliates had subverted a citizens' ballot initiative to repeal HB6 by, among other unscrupulous tactics, hiring more than 15 signature gathering firms (and thus conflicting them out of supporting the initiative) and bribing ballot initiative insiders and signature collectors;

e.  that, as a result of (a)-(d) above, defendants' statements regarding FirstEnergy's regulatory and legislative efforts were materially false and misleading; and

      f.   that, as a result of (a)-(e) above, FirstEnergy was subject to an extreme, undisclosed risk of reputational, legal and financial harm.

87.    In addition, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303") required the Company's quarterly and annual financial reports issued to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Individual Defendants' failure to disclose FirstEnergy's involvement in the massive bribery and corruption scheme detailed herein violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

### E.    The Truth Emerges

88.    On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio issued a press release titled:

**Ohio House Speaker, former chair of Ohio Republican Party, 3 other individuals & 501(c)(4) entity charged in federal public corruption racketeering conspiracy involving $60 million**

89.    Five individuals, namely: Larry Householder, Mathew Borges, Jeffrey Longstreth, Neil Clark, Juan Cespedes were arrested and charged. An 82-page criminal complaint and affidavit was filed that same day in the Criminal Proceedings. These documents detailed a brazen scheme by FirstEnergy and its affiliates and representatives to corrupt the political process and undermine democratic institutions in the State of Ohio in order to secure passage of HB6. The allegations contained in the criminal complaint and affidavit were supported by detailed transcripts of phone calls, recorded conversations, text messages, bank records and contemporaneous documentary evidence.

90.     The price of FirstEnergy stock plummeted on this news, falling to a low of just $22.85 per share on July 22, 2020, 45% below the stock's closing price on July 20, 2020 of $41.26 per share, on abnormally high trading volume. FirstEnergy shareholders have suffered massive losses as a result of these declines.

## DAMAGE TO FIRSTENERGY

91.     As a direct and proximate result of the Individual Defendants' conduct, First Energy will lose and expend many millions of dollars.

92.     Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

93.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

94.     As a direct and proximate result of the Director Defendants' conduct, First Energy has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

95.     Plaintiff brings this action derivatively to redress injuries suffered by FirstEnergy as a result of the breaches of fiduciary duties by Defendants.

96.     Plaintiff owned FirstEnergy stock during the time of the wrongful course of conduct constituting the basis for the claims asserted herein, continues to hold FirstEnergy stock, and will continue to hold FirstEnergy stock during this case.

97.     Plaintiff's claims and economic position is not antagonistic to the other shareholders, whose stock value(s) were also significantly and negatively impacted by Defendants' actions and/or inactions as alleged herein.

98.     Plaintiff will adequately and fairly represent the interests of FirstEnergy and its shareholders in prosecuting and enforcing its rights and has retained counsel competent and experienced to prosecute this action.

## DEMAND ON THE FIRSTENERGY BOARD IS EXCUSED AS FUTILE

99.     Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

100.    At the time of the filing of this action, the FirstEnergy Board was comprised of eleven directors. The current eleven directors are Defendants Anderson, Johnson, Jones, Misheff, Mitchell, Pappas, Reyes, Demetriou, Pianalto, Turner, and O'Neil.

101.    Plaintiff needs only to allege demand futility as to six of these eleven directors.

102.    Demand is excused as to all of the Director Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of their violations of law alleged herein.

103.    Demand is likewise excused because seven members of the current Board served on the Company's Board as of March 2017. Those seven members, Defendants Anderson, Johnson, Jones, Misheff, Mitchell, Pappas, and Reyes recommended that shareholders vote against a shareholder proposal requesting transparency and accountability on lobbying policies and payments that would have required disclosure of the wrongdoing at issue. Similar shareholder proposals were defeated in 2015 and 2016, with Defendants Anderson, Johnson,

Jones, Misheff, Pappas, and Reyes recommending shareholders vote against the proposals in each of those years.

104. More specifically, on March 31, 2017, the Company filed its Schedule 14A with the SEC (the "2017 Proxy Statement"). Included in the 2017 Proxy Statement was a shareholder proposal requiring an annual report on lobbying policies and payments. According to the 2017 Proxy Statement, FirstEnergy shareholder, The Nathan Cummings Foundation, planned to introduce the proposal at the Company's Annual Meeting as follows:

> **Whereas:** we believe full disclosure of our company's direct and indirect lobbying activities and expenditures is required to assess whether FirstEnergy's lobbying is consistent with its expressed goals and in the best interests of shareholders.

> **Resolved**, the shareholders of FirstEnergy request the preparation of a report, updated annually, disclosing:

> 1. Company policies and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications.

> 2. Payments by FirstEnergy used for (a) direct or indirect lobbying or (b) grassroots lobbying communications, in each case including the amount of the payment and the recipient.

> 3. FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation.

> 4. A description of the decision making process and oversight by management and the Board for making payments described in section 2 and 3 above.

For purposes of this proposal, a "grassroots lobbying communication" is a communication is a communication directed to the general public that (a) refers to specific legislation or regulation, (b) reflects a view on the legislation or regulation and (c) encourages the recipient of the communication to take action with respect to the legislation or regulation. "Indirect lobbying" is lobbying engaged in by a trade association or other organization of which FirstEnergy is a member.

Both "direct and indirect lobbying" and "grassroots lobbying communications" includes efforts at the local, state and federal levels.

The report shall be presented to the Audit Committee or other relevant oversight committee and posted on FirstEnergy's website.

As shareholders, we encourage transparency and accountability in FirstEnergy's use of corporate funds to influence legislation and regulation, both directly and indirectly. FirstEnergy spent approximately $4.05 million in 2014 and 2015 on direct federal lobbying activities (opensecrets.org). These figures do not include lobbying expenditures to influence legislation in states, where FirstEnergy also lobbies but disclosure is uneven or absent. For example, FirstEnergy spent $1.07 million on lobbying in New Jersey for 2014 and 2015, and FirstEnergy's lobbying on energy rates in West Virginia has drawn media attention ("FirstEnergy Asking for Surcharge to Fund Improvements," Charleston Gazette-Mail, August 25, 2016).

FirstEnergy is listed as a member of the of the Edison Electric Institute and Nuclear Energy Institute, which together spent $21.32 million lobbying in

2014 and 2015. However, FirstEnergy does not disclose its membership in, or payments to, trade associations, or the amounts used for lobbying, despite a 2007 agreement with shareholders to annually disclose trade association payments used for political purposes ("More Firms to Make Political Disclosures," CFO, April 4, 2007). Nor does FirstEnergy disclose membership in or contributions to tax exempt organizations that write and endorse model legislation, such as the American Legislative Exchange Council.

We are concerned that FirstEnergy's current lack of trade association disclosure presents reputational risk. Absent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long term interests.

105. FirstEnergy's 2017 Board responded to the shareholder proposal as follows:

Your company believes that it has a responsibility to participate in the legislative, regulatory and political process. Sharing its views and educating officeholders, regulators, community and business leaders, and the public on key issues helps your Company promote effective government and the interests of key stakeholder groups including our shareholders, employees and communities we serve. By engaging with elected officials, regulators, community and business leaders, and other decision makers, your Company strives to conduct its business as transparently as possible to serve customers effectively and help build public trust. In addition to the existing extensive framework of laws and public disclosure, your Company adopted a Political Activity Policy, which was most recently updated in October 2016. The Political Activity Policy addresses your Company's participation in the political process and political contributions and

lobbying expenses. Such policy can be found at: https://www.first Energycorp.com/investor/corporate_governance/policies_charters/corporate_p olitical_activity_policy.html

The Political Activity Policy also provides links to access your Company's federal lobbing reports. Your Company complies with all federal and state lobbying registration and disclosure requirements, which include filing all required reports with the U.S. Congress and applicable state agencies.

These reports detail information such as the particular bills and issues on which individual lobbyists had activity on behalf of your Company, as well as the lobbying expenses for specific time periods. As set forth in the Political Activity Policy, your Company maintains and files Lobbying Disclosure Act Reports (Form LD-2) with the U.S. Congress. These reports detail the particular bills and issues on which individual lobbyists had activity on behalf of your Company, as well as the total lobbying expenses, including payments made to trade organizations. These reports may be found at: http://www.senate.gov/legislative/Public_Disclosure/LDA_reports.htm.

Additionally, as described in the Political Activity Policy, your Company and its registered federal lobbyists must also file semi-annual reports detailing, among other things, disbursements and personal and/or direct contributions to federal candidates national party committees. These forms (LD-203) may be found at: http://www.senate.gov/legislative/Public_Disclosure/LDA_reports.htm. State reports disclosing activity at the state and local levels, if required, are also made publicly available for review on the applicable state agency website.

Your Company is committed to providing appropriate information and disclosures to its investors concerning its lobbying activities. Additionally, your Company believes that its current procedures and policies promote transparency and compliance with the law and addresses the concerns identified in the proposal. Preparation of reports beyond what is already produced would be a duplicative and onerous task that would divert important resources from alternative efforts that your Company's Board and management deem to be in the best interests of your Company and its shareholders. Substantially similar shareholder proposals did not receive a majority of the votes cast in 2015 and 2016.

Your Board recommends that you

**Vote "AGAINST" this shareholder proposal (Item 9).**

106.    Thus, the Company's Board has demonstrated long-standing opposition to transparency regarding payments to public officials at the state level, as its recommendation to vote against shareholder proposals requiring such disclosure in 2015, 2016 and 2017 demonstrate. Moreover, in 2017, just months after the illegal scheme started, a majority of the current Board recommended shareholders vote against the proposal that would have required disclosure of the illegal payments at issue, demonstrating that demand on the current Board to take action in response to the illegal payments would be futile.

107.    Demand is further excused as futile because each of the Director Defendants has received and continues to receive compensation for his or her role as Director. As trusted Directors, they conducted little, if any, oversight of the contributions at issue, and consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme,

and consciously disregarded their duties to protect corporate assets. For those reasons, too, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and therefore, excused.

108.    In addition, the sheer size of these contributions totaling in excess of $60 million could not be done without the Director Defendants' knowledge and approval. All of the Director Defendants were required to participate in both the review and approval of First Energy's activities including, without limitation, payment of approximately $61,000,000.00 designed to assist Householder's Enterprise, which resulted in a legislative kickback through the passage of House Bill 6 of approximately $1.5 Billion dollars. Indeed, Defendant Jones has publicly stated that First Energy is innocent and "acted ethically" in connection with efforts to pass House Bill 6 that federal prosecutors say were fueled by bribery, which statement acknowledges that Defendants were aware of the decision to funnel bribes to Householder's Enterprise, and approved them.

109.    All Director Defendants are directors, and their self-dealing as alleged herein resulted in direct financial gains to Defendants from the challenged transactions and actions as alleged herein, making it a substantial likelihood that each of the Director Defendants named herein will be found liable for their self-dealing actions, participation, approval and/or ratification of FirstEnergy's participation in Householder's Enterprise.

**The Audit Committee Defendants Face a Substantial Likelihood of Liability**

110.    The Audit Committee Defendants face a substantial likelihood of liability as a result of their service on the Board's Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were to oversee the Company's

systems of internal control with respect to the accuracy of financial records, adherence to Company policies and compliance with legal and regulatory requirements.

111.    The Audit Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures.

112.    In light of the foregoing actions, a majority of the Director Defendants lost their independence and/or lack the ability to bring a disinterested business judgment to bear if demand had been made relative to the Householder Enterprise.

113.    FirstEnergy has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for FirstEnergy any part of the damages FirstEnergy suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

114.    For all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least seven of them (a majority), cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is exercised as futile.

## CLAIMS FOR RELIEF

## COUNT I

### (Breach of Fiduciary Duty Against All the Individual Defendants)

115.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

116.    Each Defendant owed to the Company the duty to exercise candor, good faith, due care, and loyalty in the management and administration of FirstEnergy's business and affairs.

117.    Each of the Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, due care, reasonable inquiry, oversight and supervision.

118.    By virtue of their positions as directors and/or officers of FirstEnergy and their exercise of control over the business and corporate affairs of the Company, the Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein. Each Defendant was required to: (a) use his or her ability to control and manage FirstEnergy in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of FirstEnergy and its shareholders and not his or her own. Defendants also have the duty to oversee its CEO and ensure that he is not breaching his fiduciary duties to the Company.

119.    Additionally, Defendants have a duty to implement a reasonable system of controls to ensure that FirstEnergy is operated in conformity with applicable laws. Once that system is in place, the Directors have a duty to respond in good faith to reports or indications that FirstEnergy or its employees are engaging in unlawful or other improper behavior. Defendants have acted in violation of FirstEnergy's internal policies, including, inter alia, its policies regarding corporate governance, anti-corruption, and ethics.

120.    The Company's corporate governance guidelines also require Defendants to review compliance with applicable laws and regulations and adopt policies of corporate conduct to assure compliance with applicable laws and regulations and to assure maintenance of necessary accounting, financial, and other controls.

121.    Defendants breached their fiduciary duties through self-dealing and/or by acting to subvert and/or failing to take any action to investigate and/or stop the improper and illegal conduct at FirstEnergy involving bribery.

122.    Based on the foregoing conduct, Defendants were not acting in good faith toward the Company, but instead were acting recklessly and/or with intent to harm the Company and breached their fiduciary duties.

123.    As a direct and proximate result of Defendants' conscious failure to perform their fiduciary obligations, FirstEnergy has been and will continue to be damaged.

124.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

125.    Plaintiff, on behalf of First Energy, has no adequate remedy at law.


## COUNT II

### (Unjust Enrichment Against the Induvial Defendants)

126.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

127.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material facts that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, FirstEnergy.

128.    The Individual Defendants either benefitted financially from their improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to their false and misleading statements, or received bonuses, stock options, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

129.     Plaintiff, as a shareholder and a representative of FirstEnergy, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits – including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation – obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT III

### (Waste of Corporate Assets Against the Individual Defendants)

130.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

131.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused FirstEnergy to waste valuable corporate assets and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions.

132.     Defendants made and/or caused the Company to make, and to lose assets from investors and customers who no longer trust the Company.

133.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

134.     Plaintiff on behalf of FirstEnergy has no adequate remedy at law.

## COUNT IV

### (Insider Selling Against Jones)

135.     Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

136. At the time Jones sold his personally held FirstEnergy stock, he was an officer and/or director of the Company which gave him access, directly or indirectly, to material information about FirstEnergy not generally available to the public.

137. Jones sold FirstEnergy stock at a time when he knew material information about FirstEnergy which would have significantly affected the market price of FirstEnergy's common stock and was not generally available to the public. Specifically, Jones knew that FirstEnergy was engaging in a bribery scheme.

138. Plaintiff, on behalf of FirstEnergy, has no adequate remedy at law

## COUNT V

**(Against the Director Defendants for Violations of Section 14(a) of the Exchange Act 101)**

139. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

140. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

141. Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

142. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

143. Under the direction and watch of the Director Defendants, the Company's 2017, 2018 and 2019 Proxy Statements filed with the SEC on March 31, 2017, March 30, 2018 and April 1, 2019 (the "Proxy Statements") failed to disclose, inter alia, the illegal scheme described herein, and that the Company failed to maintain adequate controls and oversight to prevent such wrongful conduct, thus rendering the Proxy Statements false and misleading.

144. In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the forgoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxy Statements, including the election of directors, advisory approval of the executive compensation, ratification of the Company's independent auditor, and whether or not to approve the shareholder proposal requiring an annual report on lobbying policies and payments.

145. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

146. Plaintiff on behalf of FirstEnergy has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants as follows:

A.      Declaring that the Plaintiff may maintain this action derivatively on behalf of FirstEnergy and that Plaintiff is an adequate representative;

B.      Declaring that the Individual Defendants have breached their fiduciary duties to FirstEnergy;

C.      Appointing Plaintiff's counsel as Lead Counsel for this derivative action;

D.      Determining that this action is a proper derivative action maintainable under law;

E.      Determining and awarding to FirstEnergy the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

F.      Directing the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect FirstEnergy and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for more significant shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of FirstEnergy to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

G. Awarding FirstEnergy restitution from Individual Defendants, and each of them;

H. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 24, 2020

Respectfully Submitted,

*/s/ Pamela Borgess*
Pamela Borgess (0072789)
BORGESS LAW, LLC
6800 W. Central Ave. Ste. E
Toledo, OH 43617
(567) 455-5955
pborgess@borgesslaw.com

*/s/ Lee Squitieri*
Lee Squitieri
SQUITIERI & FEARON LLP
32 East 57th Street, 12th Floor
New York, New York 10022
(212) 421-6492
lee@sfclasslaw.com
*(Subject to Pro Hac Vice Admission)*

*/s/ Fletcher W. Moore*
Fletcher W. Moore
Justin Kuehn
MOORE KUEHN, PLLC
30 Wall Street, 8th Floor
New York, NY 10005
Telephone:(212) 709-8245
fmoore@moorekuehn.com
kuehn@moorekuehn.com
*(Subject to Pro Hac Vice Admission)*
*ATTORNEYS FOR PLAINTIFF*